No. 30,176.

THE STATE OF KANSAS, *Appellee,* v. E. U. EWING, *Appellant.*

(5 P. 2d 1110.)

Opinion filed December 12, 1931.

R. L. Hamilton, of Beloit, for the appellant.

*Roland Boynton,* attorney-general, *R. O. Mason,* assistant attorney-general, and *Harold N. Jordan,* county attorney, for the appellee.

The opinion of the court was delivered by

BURCH, J.: Defendant was convicted of violating the liquor law in four particulars, and appeals. He was convicted on counts charging manufacture of intoxicating liquor, making mash capable of distillation, possession of a still, and maintaining a nuisance. He was acquitted on counts charging possession and sales.

Defendant's son Harold, who lived with him, was charged jointly with defendant. Harold was not arrested, because he was a fugitive. His absence was voluntarily accounted for by defendant. Defendant was asked by the county attorney if he heard from his son now and then, and defendant answered: "Not since you run him off; he got scared at you." Defendant was preparing to become a nonresident of the state himself, but he came home in the evening of the day the sheriff searched his premises, and has been unavoidably detained. Things had not been going well with the Ewings in other respects. Defendant had another son, Wayne, who made his home with defendant. Wayne had a car, but it was confiscated when it was found in Osborne county with thirty gallons of liquor in it. On the trip to Osborne Wayne's car was driven by Earl Ewing, defendant's brother. Earl had already pleaded guilty to possession of liquor in Mankato, and Earl was in the penitentiary as a persistent violator of the liquor law at the time of defendant's trial. Defendant was with Earl on the trip to Osborne, and was arrested, and pleaded guilty to being drunk, or, as defendant corrected the county attorney, to intoxication. Then, too,

a still had been found in the home of defendant's brother, Frank Ewing, where defendant visited.

Defendant's still was found in a cave in a high creek bank in a cattle pasture, half a mile or more from defendant's house. The locality of the cave was known as Hell's Half Acre. The cave was not on defendant's land, but was readily accessible. A path led from defendant's house to the cave, and the hoofprints of defendant's saddle mare were found in the path and about the cave. There was also a roadway, and automobile tracks were found on the road and near the cave. Besides the still there were found in the cave a burner and stand, a pump, a pressure tank, an alcohol tester partly filled with distilled liquor, some sacks, and other articles. In the cave were barrels containing grain mash, and in the mash were grains of rye. In defendant's granary were sacks containing rye. In and about the house were jugs large and small, some jars, and a hose. Some of the jugs smelled of liquor. There was burnt sugar in the house, and in the cupboard of the house was a memorandum book containing entries indicating conduct of liquor business.

In discussing various assignments of error defendant relies on his own explanation of incriminating circumstances. The jury evidently disbelieved these explanations. Some of the assignments of error are trivial. Others are merely querulous. Only a few will be noticed.

The handwriting of entries in the memorandum book was not proved. The book appeared to be a record of stock in gallons, balances of quantity on hand, deliveries and sales to places and persons of quantities ranging from fractions of a gallon to multiples of a gallon, at a price of 10 per gallon, with a small discount for large quantities. One entry was:

Bottles.
Labels.
Caps.
Apricot 30.

In the record initials "W" and "F" appeared. As indicated, one of the defendant's sons was named Wayne, and defendant's brother's name was Frank. One entry was, "Due W $11.60." Defendant was charged with maintaining a nuisance. The book bore internal evidence that it was a liquor record, and it was admissible in evi-

dence, with other articles found on defendant's premises having apparent relation to conduct of liquor business there.

A day or two after the sheriff searched defendant's premises the sheriff went back. While he was at defendant's house a Smith county car with three strangers in it arrived. The sheriff prudently looked in the car and found an empty gallon glass jug. In view of all the evidence indicating maintenance of a liquor nuisance, it was inferrable the visitors knew what they wanted and where to go to get it.

The evidence showing defendant's conviction of intoxication and his connection with violation of the liquor law and liquor-law violators was developed on cross-examination of defendant. The cross-examination was proper, and the court instructed the jury on the subject. The court, however, went further and, by an inartistically framed instruction, permitted the jury to consider the acts of defendant and others as showing likelihood the defendant would commit the offenses charged.

Defendant went his length to create the impression that association with liquor business was foreign to his disposition. In his direct examination he did not stop with repudiation of connection with the still and the liquor paraphernalia in a cave and about his premises. He said he never kept or had in his possession any intoxicating liquor on his place or any other place in February, the month of the raid, or at any previous time, and never while he lived there permitted anybody to come there for the purpose of getting intoxicating liquor. His extreme care in avoiding association with the liquor business was demonstrated in his account of how he happened to plead guilty to intoxication in Osborne.

Defendant's son Wayne lived with him. Wayne had a car. One night defendant and Wayne were in Beloit, some twenty-five miles from home. Wayne's car was in Beloit. The night was dark and stormy, and defendant wanted to go home. Wayne did not want to go home. So brother Earl said he would take defendant home if defendant would first go with Earl to Osborne to do some business. Defendant knew the business Earl had been engaged in, and defendant was so careful he told Earl he would not go if Earl was peddling liquor. Earl said he just wanted to make some collections. So they went to Osborne in Wayne's car, which had thirty gallons of liquor in it. At Osborne defendant learned for the first time there was liquor in the car. Earl gave defendant some of it, and de-

fendant got drunk, that is, intoxicated, and pleaded guilty to intoxication. The car was confiscated, and Earl went to the penitentiary. So far as the record discloses the jury never did learn how this unfortunate victim of misplaced confidence got home.

The Osborne episode classified defendant, and his attempt to dissociate himself from the liquor business was disgusting twaddle. But the court was authorized to submit the episode to the jury as bearing on defendant's inclination to commit the offenses with which he was charged.

There is nothing else of sufficient importance in the case to require special mention, and the judgment of the district court is affirmed.